Filed 10/17/22 P. v. Reynoso CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F083359 |
| Plaintiff and Respondent, | (Super. Ct. No. LF013051A) |
| v. | |
| RIGO HECTOR REYNOSO, | **OPINION** |
| Defendant and Appellant. | |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County. Kenneth C. Twisselman II, Judge.

Michael Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Michael A. Canzoneri, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P. J., Poochigian, J. and Smith, J.

Defendant Rigo Hector Reynoso was found guilty of false imprisonment, inflicting corporal injury on a cohabitant, making a criminal threat, arson of an inhabited structure, and witness intimidation by use or threat of force. His sentence included upper terms on the arson and false imprisonment counts. On appeal, defendant contends that his sentence must be vacated, and the case remanded for resentencing in light of Senate Bill No. 567's (2021–2022 Reg. Sess.) (Senate Bill 567) amendments to Penal Code section 1170, subdivision (b).[1] The People disagree, arguing any error was harmless. We affirm.

## PROCEDURAL SUMMARY

On October 20, 2020, the Kern County District Attorney filed an information charging defendant with kidnapping (§ 207, subd. (a); count 1), inflicting corporal injury on a cohabitant (§ 273.5, subd. (a); count 2), making a criminal threat (§ 422; count 3), arson of an inhabited structure (§ 451, subd. (b); count 4), dissuading a witness (§ 136.1, subd. (c)(1); count 5), and carjacking (§ 215, subd. (a); count 6). As to all counts, the information further alleged that defendant had suffered a prior "strike" conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)). As to counts 1 and 3 through 6, the information also alleged that the prior conviction also qualified as a serious felony conviction (§ 667, subd. (a)).

On August 26, 2021, the jury found defendant not guilty of kidnapping, but guilty of the lesser included offense of false imprisonment on count 1, guilty as charged on counts 2 through 5, and not guilty on count 6. The jury further found true that defendant used or threatened force in the commission of count 5 (§ 136.1, subd. (c)(1)).

On September 24, 2021, the trial court sentenced defendant to an aggregate term of years as follows: on count 4, eight years (the upper term); on count 1, three years (the upper term), concurrent with the term on count 4; on count 2, one year (one-third of the

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

2.

middle term), consecutive to the term on count 4; on count 3, eight months (one-third of the middle term) consecutive to the term on count 2; and on count 5, three years (the middle term), consecutive to the term on count 3.

On the same date, defendant filed a notice of appeal.

## FACTUAL SUMMARY

### The People's Case

In early 2020, M.L. and defendant had been in a dating relationship for approximately 18 months. The relationship ended prior to her testimony on August 16, 2021.

For two to three months between approximately March 2020 and May 1, 2020, M.L. lived in Lamont in a trailer home she rented. Before she lived in the trailer home in Arvin, M.L. lived with defendant in a standalone room behind his parents' home in Lamont.

Between April 25, 2020, and April 29, 2020, while M.L. lived in the trailer home, defendant entered her home without permission. M.L. attempted to end her relationship with defendant by telling him that they should "go [their] separate ways." She explained that the last time they saw each other she had called the police. She described that she and defendant had established a pattern where she would call the police on defendant, he would be arrested, he would return in 30 days, and she would call the police again. She "was already tired" of it. After attempting to end the relationship, she told defendant to leave. He left her home, but he took her vehicle without her permission. She did not report the vehicle stolen. After each fight in which M.L. told defendant to leave, defendant told her that if he "end[ed] up doing some time in [jail he would] kill [her]." Defendant was verbally aggressive but not physically violent.

On April 30, 2020, M.L. owned a vehicle that she had recently purchased. Defendant took her vehicle without her permission. She attempted to call defendant repeatedly but he would not answer her calls. She then walked to defendant's parents'

3.

house, arriving at night. Defendant was not there so M.L. waited until he returned with the vehicle. Once defendant returned, M.L. called and told him that she wanted to sleep in his room and not see him that evening "because he sounded aggressive." Defendant sent M.L. text messages that night telling her "to go or he would burn [her] house down" and calling her names. Defendant then came to his room where M.L. was staying. He forced the door open, grabbed her by her neck and hair, hit her on the right side of her face with a closed fist, knocked her to the ground, and kicked her in the waist area when she was on her knees. During that encounter, defendant took M.L.'s cell phone. Defendant also swore at her, asked her why she came to his parents' house, and told her that she had " 'better not make any noise once [they] leave' " his room or he was going to hit her. Defendant grabbed M.L. by her arm and led her to her vehicle.

When defendant and M.L. were in her vehicle, defendant continued to shout at and insult her. He told her that if she would not provoke him, he would not behave in that way. Defendant drove the vehicle to a reservoir near Arvin.[2] He told M.L. that he was tired of her so he was going to kill her and "do his time." M.L. told defendant not to do anything he would regret. She was afraid. Defendant told her to exit the car and move toward the reservoir. She did not. He then turned on the vehicle and drove to M.L.'s trailer home.

When defendant arrived to M.L.'s trailer home, defendant grabbed her arm and said, " 'Look, dumb a[**,] … [b]ecause I am going to hit you again. I am going to hit you even harder.' " M.L. continued to be afraid. She and defendant entered her trailer

---

[2] When M.L. spoke to Rogelio Medina, a deputy sheriff with the Kern County Sheriff's Department, on May 1, 2020, she told him that defendant drove her to an unknown location. On October 13, 2020, she told Veronica Alvarez, an investigator with the district attorney's office, that defendant took her to a canal near a field in Lamont. She explained she did not know where she was because she kept her eyes closed while defendant drove. She just knew that defendant drove for approximately 30 minutes to a location at which she heard running water.

4.

home and she laid down because she did not want to talk to or see defendant. She asked him to return her cell phone. Defendant asked why she wanted her cell phone but M.L. did not respond. Defendant then used drugs and told M.L. that he wanted to have sex with her. She refused because defendant had hit her. Defendant accused M.L. of having been with another man. Defendant told M.L. to take off her pants and underwear so he could see if she had been with another man. He told her that if she refused, he would take her pants and underwear off. She took off her pants. She then noticed defendant grab a telephone and she thought that he wanted to fight again. She then ran from the trailer home because she thought defendant would kill her. She hid by a nearby two-story building across the street from her trailer home. She heard what she believed to be defendant searching for her while driving her vehicle. She heard a neighbor talking to defendant and telling him "not to do it."[3] She then heard an explosion and what she believed to be defendant driving away in her vehicle. Minutes later she heard police arrive. She clothed herself with a towel[4] that she found at the two-story building, walked to the police officers, and told them that defendant had set her trailer home on fire.

On May 1, 2020, M.L. encountered defendant unexpectedly while he was driving her vehicle. He told her, " 'Get in [her vehicle], you already know, get in' " or " 'get in the car or you know what's going to happen to you.' " She got in the vehicle because she was afraid of defendant. Defendant drove. Defendant told M.L. that if the police caught him, he was going to kill her. Defendant drove her in the vehicle for days. She attempted to escape in Barstow but defendant "beat [her] up" and told her not to try to escape again.

---

**3**     A video (that contained audio) of the arson was played for the jury. From that video, no statement by a neighbor could be heard.

**4**     A photograph was admitted showing M.L. wearing clothing when she spoke to police officers that night. She testified that a neighbor loaned her some clothing while she was wrapped in the towel.

At some point after May 1, 2020, defendant and M.L. stayed at a hotel in Lancaster. Defendant's sister came to the hotel to give him something. Defendant did not offer to let M.L. go with his sister to Bakersfield. M.L. testified that she had no contact with defendant's sister at that point. During the drive to Solano County, defendant kept M.L.'s cell phone and there were text messages back and forth between M.L.'s cell phone and defendant's sister's cell phone. M.L. testified that she did not write those messages.[5] After defendant was arrested and M.L.'s cell phone was returned to her, she received a text message and a phone call from defendant's sister.

On May 24, 2020, defendant went inside a hardware store in Stockton and M.L. drove away in her vehicle. Defendant called M.L., demanded that she pick him up, and threatened her. Defendant's sister sent a text message to M.L.'s cell phone asking her to pick him up and promising that he would not hurt her. M.L. then returned to the hardware store to pick defendant up.

On May 25, 2020, M.L. escaped when defendant stopped to refuel the vehicle in Solano County. She exited the vehicle and went into the convenience store attached to the gas station. Defendant told her to stay in the vehicle but did not physically try to stop her. She told the attendant that she needed help. On the same date, a social worker provided M.L. a hotel room. She was alone in the hotel room and made a call to her cell phone, which was in defendant's possession, from the hotel's telephone. She explained that she was trying to draw defendant to the hotel room because she knew that police officers were around and would arrest him.

In response to M.L.'s call, defendant came to the hotel and entered M.L.'s room. He closed the door to her room, barricaded the door, and took a shower. M.L. could not escape because the outer door was barricaded, she believed defendant was going to take a

---

**5** At least one of the messages from defendant's sister suggested that defendant and M.L. were in separate places—defendant in a hardware store and M.L. in her vehicle.

6.

very quick shower, he left the bathroom door open during his shower, and defendant had a knife. Police officers began calling the hotel telephone line and told defendant to exit. Defendant remained in the hotel room with M.L. for approximately five hours before he was arrested.

On May 1, 2020, at approximately 3:40 a.m., Medina and Kern County Sheriff's Deputy Izam Perez were both assigned to a patrol route for the Lamont substation. The two deputies responded to a call regarding the trailer home fire in this case. They arrived to the scene approximately five minutes after the call and found the trailer home fully engulfed in flames.

After the fire department put out the fire, M.L. approached Medina. She appeared to Medina to be "scared," "timid," and "hesitant to speak with" him. As he spoke with M.L., Medina noticed bruising on M.L., including bruises on her face and one of her arms. She also had redness on her chest. M.L. told Medina that her injuries were a result of defendant having punched and kicked her over a three-day period. M.L. identified defendant to Medina and Perez using a photograph of defendant. She told Medina that defendant had repeatedly come to her trailer home without permission, she continued to ask him to leave, and he continued to refuse. She told Medina that defendant threatened to kill her if she called the police and threatened to burn down her trailer home if she ever left him. She also detailed to Medina the events over the past days: defendant took her vehicle without permission the previous day, she walked to defendant's parents' home, defendant hit her face and kicked her abdomen, defendant grabbed her by her arms and forced her into her vehicle, defendant drove to an unknown location with running water and threatened to kill her, defendant drove her back to her trailer home, she eventually escaped from the trailer home, defendant took her vehicle, she believed defendant returned in her vehicle to set fire to her trailer home, and defendant then left again in her vehicle. She told Medina that at some point defendant took her cell phone but she did not specify when that took place.

7.

During Medina's discussion with M.L., she did not mention that she suffered a chipped or broken tooth as a result of defendant's attack on her, that she fled the trailer home only partially clothed, that defendant had demanded sex from her or that she disrobe, or that defendant used drugs in her presence on May 1, 2020. Medina photographed the injuries to M.L.'s face and arm but did not photograph her abdomen or her legs because there was no female office on scene.

Medina called M.L. on September 11, 2020. They set an appointment for M.L. to meet Medina at the Lamont Sheriff's Substation to discuss the case on the same date at around 8:00 p.m. or 9:00 p.m. M.L. did not go to the Lamont substation for the meeting, did not answer Medina's calls, and did not call him back.

Greg Ochoa was a captain with the Kern County Fire Department in the arson investigation unit. He was a firefighter for approximately 24 years and an arson investigator for 12 years. His job as a captain includes identifying the cause of every fire. He was involved in the investigation of the fire in this case. He arrived at approximately 4:45 a.m. and saw that the fire had been extinguished. A single-wide trailer burnt down to its frame was all that remained. On scene, he learned that there may have been an incident of domestic violence that prompted arson of the trailer home and that defendant made threats regarding burning M.L.'s home. He further learned that a video surveillance camera captured a portion of the arson. He obtained the video, which was played for the jury. The video depicted a person walking toward the trailer home with some unlit material in his hand; the person walked out of the view of the camera near the trailer; a "glow" appeared in the video that Ochoa opined was fire; and the person walked away. Based on the witnesses and the video of the incident, Ochoa determined that the cause of the fire was arson.

**Defendant's Case**

On May 1, 2020, at 3:50 a.m., Kern County Fire Captain Jason Knaggs responded to the fire at the trailer home. When he arrived, the trailer was "fully involved" in the fire

8.

and could not be saved. His objectives were to protect the surrounding people and property. He was not able to determine the possible cause of the fire, or the item first ignited. He could not determine whether the fire started inside or outside of the trailer home. Many things can cause fires: for instance, overheated cooking equipment, portable heaters, lit cigarettes, or faulty electrical appliances. Any of those sources could have caused the fire in this case. Knaggs did not make that determination because he turned the investigation over to the investigators. Knaggs did conclude that the circumstances of the fire were suspicious, so he contacted the battalion chief on scene to conduct a more thorough investigation. He found suspicious the complete involvement of the trailer home by the time the report came in and the comments by witnesses regarding the cause of the fire.

Knaggs watched the surveillance video of the trailer home that Ochoa obtained. He opined that the cause of the fire appeared to be incendiary but he could not determine the exact cause of the fire or who caused the fire.

On November 13, 2019, Kern County Sheriff's Deputy Benjamin Morales responded to a call regarding a vehicle theft. M.L. told Morales that defendant had taken her vehicle without permission. She represented that she was the registered owner of the vehicle but that she had also gone to the Department of Motor Vehicles to initiate a transfer to defendant. Morales conducted a registration check on the vehicle and determined that there was a registration in progress for defendant, so he did not report the vehicle stolen.

On October 13, 2020, Alvarez was assigned to conduct a "meet-and-greet" with M.L. During the conversation, M.L. told Alvarez that defendant punched her on the eye and took her cell phone while they were at defendant's parents' house on April 30, 2020. After leaving defendant's parents' home, on the evening of April 30, 2020, or early morning of May 1, 2020, defendant took her to a canal near a field in Lamont. M.L. did not mention whether her eyes were open or closed when defendant transported her. M.L.

9.

told Alvarez that, after defendant transported M.L. back to her trailer home, he injected himself with some "black substance" and then demanded sex from her. She took her pants off and then ran from the trailer home, half-clothed. She did not mention that she found a towel or borrowed clothing from a neighbor.

Nicole M. is defendant's sister. Prior to May 1, 2020, she and defendant both lived at their parents' property in Lamont. M.L. also lived with defendant in a standalone room behind defendant's parents' house. M.L. and defendant were dating. She remembered that defendant was incarcerated in 2020 at some point before May 1, 2020. After he was released from custody, M.L. continued to date him. Nicole heard M.L. tell defendant's mother that she loved defendant after he was released from jail but before May 1, 2020. M.L. appeared to Nicole to be comfortable in defendant's presence and affectionate to him at that time.

Nicole never saw defendant attack M.L. or verbally insult her. She never saw M.L. with any injuries. She was never made aware that defendant was being violent with M.L. or threatening her. Nicole saw M.L. crying at defendant's parents' house when defendant told her to leave but M.L. yelled that she did not want to leave.

After May 1, 2020, M.L. came to defendant's parents' house a couple times and "act[ed] crazy." Specifically, M.L. repeatedly drove her car "up and down the road [in front of defendant's parents' house] really fast" while honking her vehicle's horn for about seven minutes and eventually hit the neighbor's car. Nicole told M.L. to "stop acting crazy." She did not understand M.L.'s response because it was in Spanish. Nicole testified that M.L. appeared to be under the influence of some intoxicating substance based on her behavior and her dilated eyes. Another time after May 1, 2020, Nicole heard M.L. outside of defendant's room, screaming for him to let her in. Nicole testified that she did not think M.L. was under the influence of any intoxicating substance on that date.

10.

Jessica M. is also defendant's sister. She lived at her parents' house with defendant and M.L. from 2018 to 2019. M.L. twice asked Jessica to post bail for defendant; once in 2019 and once in 2020. After Jessica bailed defendant out the second time, defendant and M.L. appeared to continue to be in a dating relationship. At no point did Jessica think that defendant had hurt M.L. or that M.L. was afraid of defendant. She never saw any injuries to M.L. She thought M.L. stayed with defendant voluntarily but her opinion might change if she knew that defendant had threatened to kill M.L. if she left him or threatened to burn down her home.

On May 6, 2020, M.L. sent Jessica a text message, asking defendant's location. M.L. told Jessica that defendant had been gone for an hour and a half and had left the keys to the vehicle with her at the motel room they rented together in Bakersfield. Sometime after May 1, 2020, Jessica drove to a motel in Lancaster to give defendant money. M.L. was also present at the motel. Defendant offered to have M.L. return with Jessica but M.L. declined, saying that she wanted to stay with him. At another time in May 2020, M.L. and defendant drove to Jessica's home and left a vehicle in her front yard. At that time, M.L. and defendant appeared to still be in a dating relationship. On May 24, 2020, Jessica received a call from defendant, informing her that M.L. had left him at a store and asking her to contact M.L. Jessica sent M.L. a text message, asking her to pick defendant up. On May 25, 2020, M.L. sent Jessica a text message asking if she could come pick up the vehicle that she left in Jessica's yard.

After defendant was arrested, Jessica, defendant, and M.L. had a three-way phone call. Jessica asked M.L. "why … she [was] press[ing] these charges." M.L. "just started going crazy, saying she didn't know why." After defendant exited the call, M.L. told Jessica that she would "call the D.A. and she was going to drop the charges."

Two of M.L.'s neighbors from her trailer home testified that they did not witness anyone starting the trailer fire and did not hear any signs of domestic violence from the trailer home before it was burned.

Samantha Bone was an investigator for the public defender's office. On April 28, 2021, she went to the one canal that she found in Lamont, approximately 1.3 miles from defendant's parents' house. The water was mostly still, and she did not hear any running water from about 10 feet. She then drove to the Kern River, about 20 miles from defendant's parents' house. She heard running water from approximately 30 to 50 feet.

## DISCUSSION

### I. Senate Bill 567

Defendant contends that we must vacate the sentence and remand the matter because he did not admit, and the jury did not find true, the facts underlying the circumstances in aggravation that the trial court relied upon in imposing the upper term. The People agree that Senate Bill 567 is retroactive to defendant but argue any error in imposition of the upper term is harmless beyond a reasonable doubt. We agree that any error in imposing the upper term was harmless because a jury would have found true the aggravating circumstances beyond a reasonable doubt.

As we explain below, to find that any error was harmless we would have to conclude (1)(a) beyond a reasonable doubt that the jury would have found beyond a reasonable doubt that the facts underlying at least one aggravating circumstance was true,[6] and (1)(b) that there is no reasonable probability the jury would not have found the remaining circumstances true beyond a reasonable doubt, or if fewer than all circumstances are provable pursuant to part (1)(b) of this analysis, (2) that there is no reasonable probability the trial court would have imposed a lesser term based on the

---

[6] Alternatively, this step is satisfied if, in imposing the upper term, the trial court relied upon an aggravating circumstance the underlying facts of which defendant admitted, or the trial court relied on defendant's prior convictions as an aggravating circumstance in consideration of a certified record of defendant's convictions.

This first step of the harmless error inquiry is demanded by the Sixth Amendment. If it is not met, the analysis stops, and we conclude that the error was not harmless because the sentence violates the Sixth Amendment.

aggravating circumstances that would have been provable to the jury beyond a reasonable doubt.

For the following reasons, we conclude the sentence does not comply with the requirements of section 1170, subdivision (b), but any error was harmless.

### A. Additional Background

The trial court adopted the probation officer's recommendation regarding the following five circumstances in aggravation and no circumstances in mitigation. In aggravation, the court found:

> "One, the defendant's prior convictions as an adult are numerous and increasing in seriousness, as evidenced by the instant offense and prior convictions for … [s]ection 245(a)(1), [s]ection 148.9(a), Vehicle Code 2800.2, 23152(a), … [s]ection 245(a)(4), and … [s]ection 460(b). That's the first circumstance. Two, the defendant has served three prior prison terms and two … [s]ection 1170 [s]ubdivision (h) commitments. Three, the defendant was on three grants of misdemeanor probation when the crime was committed. Four, the defendant's prior performance on misdemeanor and felony probation, parole, and/or post-release community supervision was unsatisfactory in that he violated terms and/or reoffended. Five, at the time the offense was committed the defendant had an active warrant for his arrest in Tulare County Superior Court Case No. 1377375 and Kern County Superior Court Case No. MM096383A. Citing Rule 4.408."

In light of those aggravating circumstances, the trial court concluded, "that the circumstances in aggravation justify imposition of the upper term." The trial court then imposed the upper term on counts 4 and 1.

Defendant did not admit, and the jury did not find true—with the exception of finding defendant guilty of the charged offenses, which the trial court considered with respect to the first aggravating circumstance—any of the aggravating circumstances relied upon by the trial court in imposing the upper term. The record does not reflect that the trial court relied upon any certified record of defendant's convictions in making findings regarding his prior criminality.

13.

## B. Analysis

From March 30, 2007, to January 1, 2022, California's determinate sentencing law specified that "[w]hen a judgment of imprisonment [wa]s to be imposed and the statute specifie[d] three possible terms, the choice of the appropriate term … rest[ed] within the sound discretion of the court." (§ 1170, former subd. (b).)

Effective January 1, 2022, Senate Bill 567 amended section 1170, subdivision (b). (Stats. 2021, ch. 731, § 1.3.) Section 1170, subdivision (b)(2) now provides, "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) As an exception to the general rule, a trial court is permitted to rely upon a certified record of conviction to determine prior criminality for purposes of sentencing without submitting the prior conviction to a jury. (§ 1170, subd. (b)(3).)

As a threshold matter, the parties agree, as do we, Senate Bill 567 is retroactive to cases not yet final on appeal pursuant to *In re Estrada* (1965) 63 Cal.2d 740 (see *People v. Dunn* (2022) 81 Cal.App.5th 394, 402–403 (*Dunn*); *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038–1039) and defendant's sentence is not yet final on appeal.

In this case, as to the first circumstance in aggravation found true by the trial court, that "defendant's prior convictions as an adult are numerous and increasing in seriousness," the jury made no finding (except that defendant committed the offenses of conviction) and the record does not indicate that the trial court relied upon a certified record of conviction. As to the second through fifth circumstances—defendant's prior prison and section 1170, subdivision (h) commitments, defendant's probation status when he committed the offenses at issue in the case, defendant's unsatisfactory performance on probation, parole, and postrelease community supervision, and defendant's active

14.

warrants in other cases at the time of the offenses—the jury made no findings and defendant entered no stipulations.

Despite none of the aggravating circumstances having been proved in compliance with section 1170, subdivision (b)(2) and (3), the upper term was imposed on counts 1 and 4. Imposition of the upper term on counts 1 and 4 is not in compliance with section 1170, subdivision (b).[7] Therefore, unless imposition of the upper term on counts 1 and 4 was harmless, the sentence must be vacated and the matter remanded to the trial court for resentencing in compliance with section 1170, subdivision (b).

The People contend that any error is harmless because all factors were provable beyond a reasonable doubt. They appear to also suggest that even if not all aggravating circumstances were provable beyond a reasonable doubt, the trial court would nevertheless have imposed the upper term because "the law does not require the trial court to rely on a minimum number of aggravating circumstances" and "as long as a jury could have found a single aggravating circumstance true beyond a reasonable doubt, any error was harmless." For the proposition that error was harmless if the jury would have found a single aggravating circumstance true beyond a reasonable doubt, the People rely on *People v. Flores* (2022) 75 Cal.App.5th 495, which applied the harmless-beyond-a-reasonable-doubt standard of harmless error from *Chapman v. California* (1967) 386 U.S. 18 as adapted to the context of violations of the Sixth Amendment right to a jury trial on aggravating circumstances by *People v. Sandoval* (2007) 41 Cal.4th 825, 838–839.[8] (*Flores*, at pp. 500–501.)

---

[7]    Again, we note that the law has changed since the trial court imposed the sentence in this case. At the time the court imposed the sentence, it complied with the applicable law.

[8]    *Sandoval*, as we explain in more detail below, considered the standard for harmless error in the context of *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*) error—where a sentence in excess of the statutory maximum sentence was

15.

This court rejected the approach taken by *Flores* in *Dunn*, *supra*, 81 Cal.App.5th at pages 409–410. We conclude the trial court's imposition of the upper term did not meet the requirements of section 1170, subdivision (b), but the error was harmless based on the standard this court articulated in *Dunn*:

> "The reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt[9] and (1)(b) whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt. If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was harmless. If not, the reviewing court moves to the second step of *Lopez*, (2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps. If the answer is no, the error was harmless. If the answer is yes, the reviewing court vacates the sentence and remands for resentencing consistent with section 1170, subdivision (b)." (*Dunn*, *supra*, 81 Cal.App.5th at pp. 409–410.)

With that standard in mind, we revisit the aggravating circumstances relied upon by the trial court.

We begin by noting that all the aggravating circumstances relied upon by the trial court were historical considerations rather than considerations related to the nature of the present offense. Further, defendant and his counsel were provided a copy of the probation officer's report detailing defendant's extensive criminal history, incarceration

---

imposed under California's former determinate sentencing law without submitting the facts authorizing such a sentence to a jury.

**9** "Alternatively, this step is satisfied if the trial court relied upon an aggravating circumstance that relied only upon the fact of defendant's prior convictions and a certified record of defendant's convictions was admitted, or defendant admitted the facts underlying an aggravating circumstance. [¶] … [S]tep (1)(a) or one of its two alternatives must be satisfied to avoid offending the Sixth Amendment …. If not, the error is not harmless; the sentence must be vacated and the matter remanded to the trial court for resentencing consistent with section 1170, subdivision (b)." (*Dunn*, *supra*, 81 Cal.App.5th at p. 410.)

16.

record, probation, parole, and postrelease community supervision history, pending charges and bench warrant from Tulare County, and active grants of probation. (See § 1203d.) Specifically, defendant was convicted of: reckless exhibition of speed (Veh. Code, § 23109, subd. (c)) in 1996, and violated probation in 1997; forgery (§ 470, subd. (a)) in 1997, and violated probation in 1998; possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)) in 1998, violated probation in 1999, and was committed to custody in 2000; assault with a deadly weapon (§ 245, subd. (a)(1)) in 1998, violated probation in 1999, was committed to custody for three years, then violated parole twice; driving without a license (Veh. Code, § 12500, subd. (a)) in 1999, and violated probation that year and the following year; possession of a controlled substance (Health & Saf. Code, § 11357, subd. (b)) and falsely identifying himself to a police officer (§ 148.9 subd. (a)) in 1999, and violated probation in 2000; public intoxication (§ 647, subd. (f))[10] in 2001; being under the influence of a controlled substance (Health & Saf. Code, § 11550, subd. (a)) and being present in a place where controlled substances are being used (Health & Saf. Code, § 11365) in 2002; petty theft (§ 488) in 2003; two counts of driving on a suspended license (Veh. Code, § 14601.1, subd. (a)) and petty theft (§ 666) in 2006, violated probation less than one month later, and was sentenced to jail; receiving stolen property (§ 496, subd. (a)) in 2006 for which he was sentenced to prison, and upon release he violated parole; petty theft (§ 666) in 2010 for which he was sentenced to prison; being under the influence of a controlled substance (Health & Saf. Code, § 11550, subd. (a)) in 2011; evading a peace officer with wanton disregard for persons or property (Veh. Code, § 2800.2) and driving under the influence of alcohol (Veh. Code, § 23152, subd. (a)) in 2011, violated probation three times in 2012, was committed to prison, and violated postrelease community supervision twice in 2014;

---

**10**    The probation report reflects that defendant violated Vehicle Code section 647, subdivision (f), but no such section exists.

possession of paraphernalia (Health & Saf. Code, former § 11364.1, now § 11364) in 2012; second degree burglary (§ 460, subd. (b)) in 2012 for which he was sentenced to prison; possession of paraphernalia (Health & Saf. Code, former § 11364.1, now § 11364) in 2013; assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)) and forgery (§ 470, subd. (d)) in 2014 for which he was sentenced to prison; forgery (§ 470, subd. (d)) in 2016, violated probation three times in 2017, was sentenced to a split sentence the same year, violated mandatory supervision twice in 2019, and was again returned to custody in 2020; trespassing (§ 602.5, subd. (a)) and possession of burglary tools (§ 466) in 2017, violated probation in 2018, and had his probation extended to 2022; second degree burglary (§ 460, subd. (b)) in 2017 for which he was sentenced to a split sentence, and violated mandatory supervision in 2019; two counts (in separate cases) of petty theft (§ 488) in 2019, for which he was sentenced to two separate three-year terms of probation; theft (§ 484, subd. (a)) in 2019; and forgery of automotive documents (Veh. Code, § 4463, subd. (a)(1)) in 2019. The probation officer's report reflects that the information regarding defendant's criminal history was obtained from the Federal Bureau of Investigation's Criminal Justice Information Services, the Department of Justice's Criminal Identification and Information database, the Department of Motor Vehicles' database, and defendant's juvenile records, among others. The probation report also noted that "[a]ccording to the defendant, he [had] pending charges for a new case in Tulare County" and the officer confirmed that "defendant ha[d] a bench warrant hold from Tulare County" for burglary (§ 459) and grand theft (§ 487, subd. (a)) offenses.

At the sentencing hearing, defendant's counsel was invited to present "any evidence or argument." Defendant's counsel argued that the sentences on counts 2, 3, and 5 should run concurrently to the sentence on count 4. Neither defendant nor his attorney contested the accuracy of any of the facts underlying the aggravating circumstances as outlined by the probation officer. There is no logical reason that defendant and his counsel would not have challenged the accuracy of his offense,

18.

probation, parole, postrelease community supervision, and prison records, as well as his pending charges and warrant if not true. If any of that information was incorrect, defendant could have proved that it was untrue with relative ease.

On the record before us, we conclude beyond a reasonable doubt[11] that the jury would have found true beyond a reasonable doubt that (1) defendant's prior convictions as an adult were numerous and increasing in seriousness, (2) defendant served three prior prison terms and two section 1170 subdivision (h) commitments, (3) defendant was on three grants of misdemeanor probation when the crime was committed, (4) defendant's prior performance on misdemeanor and felony probation, parole, and/or postrelease community supervision was unsatisfactory in that he violated terms and/or reoffended, and (5) at the time the offense was committed, defendant had an active warrant for his arrest. The noncompliance with section 1170, subdivision (b) was harmless.

**DISPOSITION**

The judgment is affirmed.

---

**11** We note that under *Dunn*, we are only required to find beyond a reasonable doubt that the jury would have found true beyond a reasonable doubt one aggravating circumstance. As to the other aggravating circumstances, we need only conclude that there is no reasonable probability the jury would not have found those factors true. (*Dunn*, *supra*, 81 Cal.App.5th at pp. 409–410.)

19.